# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

In the Matter of:                           }
JAMES CARLTON NIX, III                      }      CASE NO. 17-81289-CRJ-7
SSN:   XXX-XX-3015                          }
                                            }      CHAPTER 7
     Debtor.       }

PNC BANK, N.A.                              }      A.P. No. 17-80083-CRJ-7
                                            }
    Plaintiff,          }
  v.                              }
                                            }
JAMES CARLTON NIX, III                      }
                                            }
    Defendant.          }

## MEMORANDUM OPINION ON COMPLAINT
## TO DETERMINE DISCHARGEABILITY

This Adversary Proceeding came before the Court on May 15, 2018 for trial on the Complaint to Determine Dischargeability filed by PNC Bank, N.A. against the Defendant, Dr. James Carlton Nix, III (hereinafter the "Defendant" or "Dr. Nix") seeking a determination that the debt owed by the Defendant is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) as a debt for money obtained by actual fraud and as a debt for willful and malicious injury.

At the conclusion of the trial, the Court entered an Order Requiring Post-Trial Briefs, directing the parties to apply the Eleventh Circuit's holding in the case of *Monson v. Galaz (In re Monson),* 661 Fed. Appx. 675 (11th Cir. 2016) to facts of this case.[1] On June 15, 2018, the parties filed their respective post-trial briefs.  The Court has now fully considered the post-trial briefs, the testimony and evidence presented at trial, and the applicable law, and finds that the Plaintiff

---

[1]  Order Requiring Post-Trial Briefs, ECF No. 30.

has proven by a preponderance of the evidence that the debt at issue is nondischargeable under § 523(a)(6). The Court further finds that the Plaintiff failed to establish nondischargeability under § 523(a)(2)(A).

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

## FINDINGS OF FACT

1. Prior to trial, the parties filed a joint Proposed Pre-Trial Order in which they stipulated as follows:

   a. On September 14, 2006, the Defendant, Dr. Nix, borrowed $75,000 from First American Bank. The purpose of the loan was to purchase membership units in Crestwood Healthcare LP (hereinafter "Membership Units"). Dr. Nix purchased a total of 10 units. He purchased five Membership Units with the $75,000 loaned to him by First American Bank. He financed the other five with a loan from Wells Fargo.

   b. Dr. Nix executed and delivered a Note and Security Agreement dated September 14, 2006 (the "Note") by which he promised to pay First American $75,000 on or before October 14, 2016. The Note required Dr. Nix to make quarterly interest payments at a rate of 7.5%.

   c. In conjunction with obtaining the loan, Dr. Nix executed and delivered to First American Bank a Pledge and Security Agreement dated September 14, 2016 [sic][3] pursuant to which he pledged his interest in the 5 Membership Units to First American and any proceeds of the Membership Units as collateral for the $75,000 loan.

   d. Plaintiff PNC Bank, N.A. is the successor in interest to First American Bank. On June 21, 2008, First American merged into and subsequently operated as a part of RBC Bank. On March 2, 2012, RBC Bank merged into and subsequently operated as a part of PNC Bank (First American, RBC Bank, and PNC Bank are referred to hereinafter as "PNC").

---

[2] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Further, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

[3] *See* Plaintiff's Ex. 2, Pledge and Security Agreement dated September 14, 2006.

2

e. In December 2009, Dr. Nix sold 4 Membership Units to Crestwood Hospital, LLC for $57,908. Crestwood Hospital, LLC is an affiliate of Community Health Systems, Inc. ("CHS"), the corporate parent of Crestwood Healthcare, LP. Dr. Nix received the $57,908 in sale proceeds. Dr. Nix never told PNC about the sale and never told Crestwood Hospital, LLC, CHS, or any person that he had financed the purchase of his units or that the Membership Units were pledged to PNC. In connection with the sale, Dr. Nix represented that he had not pledged an interest in the units to any other person.

f. In November 2011, Dr. Nix sold 2 more Membership Units to Crestwood Healthcare, LP for $35,382.

g. In November 2012, Dr. Nix sold 2 Membership Units to Crestwood Healthcare, LP for $37,282.

h. In September 2015, Dr. Nix sold his last 2 Membership Units to Crestwood Hospital, LLC for $55,172.

i. When Dr. Nix sold the units, he did not pay any of the sale proceeds to PNC. Rather, Dr. Nix used the sale proceeds to pay his other debts including the IRS.

j. Between March 5, 2012 and July 25, 2016, Dr. Nix made quarterly interest payments.

k. Dr. Nix paid PNC a total of $51,493 in interest and $10,397.21 in principal.

l. On October 14, 2016, the maturity date of the Note, the principal balance of the Note was $64,602.79.

m. On December 19, 2016, PNC sent Dr. Nix a letter informing him of an "Event of Default" under the Note and Security Agreement based on nonpayment and securitization as of October 14, 2016, the maturity date of the Note. PNC chose "not to exercise its rights and remedies under the Agreement at this time as a consequence of this Event of Default…"

n. Dr. Nix filed for relief under Chapter 7 of the Bankruptcy Code on April 26, 2017 in the Northern District of Alabama, Northern Division. PNC Bank is listed as an unsecured creditor in the Chapter 7 bankruptcy case.

o. On August 31, 2017, PNC filed a Complaint against Dr. Nix seeking to have the debt owed declared non-dischargeable pursuant to 11 U.S.C. § 523(a).

p. Dr. Nix filed his Answer to the Complaint on October 4, 2017 denying all liability which would make this debt non-dischargeable.[4]

---

[4] Proposed Pre-Trial Order, ECF No. 27.

3

2.  For clarity, the Court will hereinafter refer to Crestwood Hospital, LLC, Community Health Systems, Inc., and Crestwood Healthcare, LP as either "Crestwood" or the "Hospital" and to the Plaintiff as "PNC" or the "Bank".

3.  Dr. Nix first sought to resell the Membership Units to the Hospital in 2007 soon after he purchased them, but the Hospital declined. Dr. Nix testified that he would have paid back the Bank's loan in 2007 had the Hospital been willing to repurchase the Membership Units when he first sought to sell them.

4.  Instead, the Defendant sold the Units to the Hospital in a series of four transactions for a total of $185,744 over a period of seven years. Dr. Nix testified that he did not inform the Bank when he sold the Units and that he did not use the proceeds to pay the Bank's loan. Instead, Dr. Nix admits that he used the proceeds from each sale primarily to pay business expenses. By 2009, Dr. Nix explained that he owned two businesses in Huntsville, his medical practice and a medical spa.

5.  On December 2, 2009, Dr. Nix sold four Membership Units to the Hospital for $57,908.[5] Dr. Nix never told PNC about the sale and never told the Hospital that the Membership Units were pledged to PNC. In connection with the sale, Dr. Nix signed a Letter of Transmittal dated December 2, 2009 pursuant to which he represented as follow:

> I am the sole legal and beneficial owner of the Units tendered by me, and I have not conveyed, assigned, transferred, or pledged any direct or indirect interest therein to any other person or entity. NOTE:  *If any Units have been pledged to a financial institution, written instructions to tender the Units, as well as instructions for the delivery of payment therefore, JOINTLY SIGNED BY THE OFFEREE AND THE FINANCIAL INSTITUTION, must accompany this letter.*[6]

---

[5]  Defendant's Ex. 4.
[6]  Plaintiff's Ex. 12, Letter of Transmittal dated December 2, 2009 (emphasis in original).

4

6.    Dr. Nix did not obtain written instructions from PNC to tender the Units nor instructions

for delivery of payment. The Defendant also failed to inform PNC about either the sale of

the Membership Units or the receipt of the proceeds. Instead, the Defendant testified that

he primarily used the funds to pay the Internal Revenue Service and other business related

expenses.

7.    On November 8, 2011, Dr. Nix sold two Membership Units to the Hospital "free and clear

of all liens, security interest and encumbrances."[7] The Defendant did not inform the

Hospital about the Pledge and Security Agreement. He received $35,382 from the sale of

the Membership Units and used the funds primarily to pay taxes and other expenses.

8.    On November 8, 2012, Dr. Nix sold two additional Membership Units to the Hospital for

$37,282 "free and clear of all liens, security interests and all encumbrances."[8]  Dr. Nix did

not inform the Hospital about the Pledge and Security Agreement, nor did he inform PNC

about the sale.

9.    On September 25, 2015, Dr. Nix sold his final two Membership Units to the Hospital for

$55,172. In connection with the sale, Dr. Nix signed a Letter of Transmittal dated

September 25, 2015 pursuant to which he again represented to the Hospital that he had not

pledged the Membership Units to any other person or entity.[9] He did not tell PNC about

the sale nor the Hospital about the pledge. Dr. Nix testified once again that he used the

proceeds primarily to pay taxes and other business debts. By 2015, Dr. Nix explained that

he owed the Internal Revenue Service approximately $200,000.

---

[7]    Defendant's Ex. 6, Notice of Exercise.
[8]    Defendant's Ex. 7, Exercise of Redemption Rights.
[9]    Plaintiff's Ex. 25, Letter of Transmittal.

10.    Dr. Nix contends that he did not understand that he had pledged the Membership Units to PNC. According to his testimony, in his mind, the loan was a personal loan and there was nothing that prevented him from selling the Membership Units back to the Hospital. On cross-examination, Dr. Nix admitted that he has taken out several personal loans over the years secured by real property, vehicles, and a boat. Each time the Defendant sold the collateral securing these loans, he understood that he had to pay off the loans with the sales proceeds. In addition, Dr. Nix admitted that he obtained several business loans to purchase medical and office equipment, granting a security interest each time to secure the loans.

11.    An Asset Resolution Manager for the Bank, Christopher Martin (hereinafter "Martin"), testified that Dr. Nix consistently made payments to PNC until July 25, 2016, totaling $51,493 in interest and $10,397.21 in principal. After Dr. Nix failed to pay the balance owed when the Note matured in October of 2016, Martin sent the Defendant a reservation of rights letter dated December 19, 2016 notifying Dr. Nix that his failure to comply with the repayment and securitization terms of the Note and Security Agreement constituted an Event of Default.[10]

12.    The Pledge and Security Agreement define the term "Event of Default" as the occurrence or existence of one of more of the following:

> (a) Default in the payment of the principal of, interest on, or charges and expenses related to the Note;
>
> (b) Failure by Borrower to pay or perform any other loan, indebtedness, liability or obligation to Lender as and when due; or

---

[10]    Defendant's Ex. 10.

(c) Failure by Borrower, any guarantor or any other person or entity to observe or comply with any covenant, obligation or provision contained or referenced in the Note or in any of the Loan Documents.[11]

13. Martin explained that PNC chose not to exercise its rights and remedies under the Note and Security Agreement in December of 2016 because the Bank was not aware that Dr. Nix had sold its collateral. Although PNC knew that it did not have possession of the Membership Units, the Bank was unaware that Dr. Nix had sold the Membership Units in violation of the Pledge and Security Agreement.[12]

14. According to Martin, internal bank records reflect that a PNC employee contacted Dr. Nix by telephone on June 20, 2014 to inquire regarding the location of the Membership Units.[13] Although the Defendant had sold eight of the ten Membership Units to the Hospital by this time, Dr. Nix responded that he would check with his wife and get back with the Bank. Instead, Dr. Nix sold the last two Membership Units on September 25, 2015 to the Hospital for $55,172.

15. The CFO of Crestwood, Sheri Jones (hereinafter "Jones"), testified that the Hospital did not have a record that Dr. Nix had pledged his Membership Units to PNC when the Hospital repurchased the Units. Jones explained that the Hospital did not actually issue certificates or certificate numbers for individual Membership Units. Jones testified that the Hospital would have notified PNC when the Hospital purchased the Membership Units from Dr. Nix had the Defendant informed the Hospital that they were pledged to the Bank any time he actually sold the Membership Units.

---

[11] Plaintiff's Ex. 2, ¶9.
[12] *See* Plaintiff's Ex. 33, Diary Information.
[13] Id.

7

16.    At trial, counsel for PNC stipulated that PNC did not file a UCC-1 perfecting its interest in the Membership Units.

17.    Dr. Nix testified that he never intended to deceive PNC and that he intended to repay the loan from dividends. The Defendant made quarterly interest payments for approximately ten years until 2016 when Blue Cross Blue Shield ("BCBS") dramatically cut his reimbursements and he could no longer maintain his businesses. According to Dr. Nix, his bankruptcy filing was unrelated to the PNC loan. It was precipitated, instead, by BCBS unilaterally changing its reimbursement policies which had an adverse effect on the Defendant's businesses.

## CONCLUSIONS OF LAW

A fundamental objective of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort."[14] To effectuate this fresh start policy, the "Bankruptcy Code contains broad provisions for the discharge of debts, subject to" the limited exceptions enumerated under 11 U.S.C. § 523(a) which are to be narrowly construed.[15] However, the Bankruptcy Code's "'fresh start' policy is only available to the 'honest but unfortunate debtor.'"[16]

The Supreme Court has explained that the applicable standard of proof in all § 523(a) dischargeability proceedings is the "ordinary preponderance-of-the-evidence standard." [17]

---

[14]    *Beem v. Ferguson (In re Ferguson),* 713 Fed. Appx. 974, 977 (11th Cir. 2018)(*quoting* In re St. Laurent, 991 F.2d 672, 680 (11th Cir. 1993)).

[15]    *Lamar, Archer & Cofrin v. Appling (In re Appling),* 138 S. Ct. 1752, 1758 (2018).

[16]    *In re Ferguson,* 713 Fed. Appx. at 977 (*quoting In re Fretz,* 244 F.3d 1323, 1326 (11th Cir. 2001)).

[17]    *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

8

Thus, the Bank bears the burden of establishing by a preponderance of the evidence that the debt at issue should be excepted from the Defendant's Chapter 7 discharge pursuant to one of the exceptions under § 523(a).[18]

## I. Standard under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt that results from "willful and malicious injury by the debtor to another entity or to the property of another entity."[19] The terms willful and malicious are distinct concepts for purposes of § 523(a)(6). The term willful "means 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.'"[20] "'Malicious' means 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.'"[21]

A "[w]illful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights."[22] The deliberate sale of collateral and conversion of the proceeds without payment to the secured creditor may also prevent discharge where the debtor commits a "knowing breach of a clear contractual obligation that is certain to cause injury."[23] As explained by the

---

[18] *See Kane v. Stewart Tilghman Fox & Bianchi (In re Kane),* 755 F.3d 1285, 1293 (11th Cir. 2014)(citing Grogan v. Garner, 498 U.S. 279, 291 (1991)).

[19] 11 U.S.C. § 523(a)(6).

[20] *In re Ferguson*, 713 Fed. Appx. at 983 (*quoting Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).

[21] *Id.* at 983-84 (*quoting In re Jennings,* 670 F.3d 1329, 1334 (11th Cir. 2012)).

[22] *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52 (11th Cir. 1995); *See also Ford Motor Credit v. Owens (In re Owens)*, 807 F.2d 1556 (11th Cir. 1987)(finding a corporate debt nondischargeable in the personal bankruptcy of a corporate officer where the debtor actively participated in the conversion of automobiles by the corporation); *In re White,* 2018 WL 1902491 *3 (Bankr. N.D. Ala. 2018)("A willful and malicious conversion constitutes a willful and malicious injury for purposes of nondischargeability."); *Hill v. Fritz (In re Fritz),* 2017 WL 1229706 *9 (Bankr. N.D. Tex. 2017)("Willful conversion of another's property . . . falls within section 523(a)(6).").

[23] *Monson v. Galaz (In re Monson),* 661 Fed. Appx. 675, 683 (11th Cir. 2016).

9

Eleventh Circuit, "dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach."[24]

### a. Willful Injury

For purposes of § 523(a)(6), a "debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[25] "Negligently or recklessly inflicted injuries do not fall within the ambit of § 523(a)(6)."[26]

The Eleventh Circuit has acknowledged that the Circuits are split as to "whether the term 'substantial certainty' is a subjective standard, requiring a creditor to prove that the debtor actually knew that the act was substantially certain to injure the creditor, or an objective standard, requiring a creditor to show only that a debtor's act was in fact substantially certain to cause injury."[27] The Court of Appeals has declined on two at least occasions to parse the distinction, finding each time that even under the more stringent subjective standard that the evidence in the cases before it supported a finding of nondischargeability.[28]

In the case of *Monson v. Galaz (In re Monson)*, the creditor loaned the debtor $130,000 to open an internet gaming center. The debtor and creditor entered into an agreement which provided that the creditor would loan the debtor $130,000 for the creation of the center. The agreement further provided that in the event the parties agreed to terminate the business, that all material assets would be liquidated and first used to pay back the loan. After law enforcement raided the

---

[24]    *Id.*

[25]    *In re Kane*, 755 F.3d at 1293(*quoting In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012)).

[26]    *Chicago Regional Council of Carpenters Welfare Fund v. Van Der Laan (In re Van Der Laan),* 556 B.R. 366, 381 (Bankr. N.D. Ill. 2016).

[27]    *In re Kane*, 755 F.3d at 1293; *In re Monson*, 661 Fed. Appx. at n. 9.

[28]    *Id.*

gaming center and seized the equipment, the creditor issued a notice to the debtor terminating his interest in the center and demanding liquidation of the assets to repay the loan. Instead, the debtor entered into an agreement with law enforcement that permitted him to retrieve the equipment upon agreeing to remove the equipment from the county. Upon retrieving the equipment, the debtor absconded with the equipment and failed to pay the creditor pursuant to the terms of their agreement.[29] After the creditor obtained a judgment against the debtor in state court, the debtor filed for relief under Chapter 7 of the Bankruptcy Code, and the creditor filed a complaint seeking to have the judgment excepted from discharge.

At trial, the debtor argued that once he received a notice of default and a letter from the creditor purporting to terminate their agreement, he believed that their entire agreement was "finished, and done with."[30] The debtor also disputed whether the creditor had a valid security interest in the equipment because the debtor never signed the security agreement despite having agreed to sign any required documents.

The Eleventh Circuit affirmed the bankruptcy court's finding that the debtor committed a willful and malicious injury within the meaning of § 523(a)(6). The act of absconding with the creditor's collateral and using it to open a new business was an "intentional act the purpose of which [was] to cause injury or which [was] substantially certain to cause injury."[31] While the debtor argued that applying a "tort-like standard to breaches of contract would 'dramatically expand the number of nondischargeable debts and diminish the scope of the bankruptcy discharge," the Court of Appeals explained that "the dischargeability of contractual debts under

---

[29]    *In re Monson*, 661 Fed. Appx. 675 (11th Cir. 2016).
[30]    *Id.* at 678.
[31]    *Id.* at n. 9.

11

Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort."[32]

Here, Dr. Nix borrowed $75,000 from PNC to purchase five Membership Units in Crestwood and executed a Pledge and Security Agreement pursuant to which he pledged his interest in the Membership Units to the Bank and any proceeds of the Units as collateral for the loan. Pursuant to the terms of the Pledge and Security Agreement, Dr. Nix had a duty to turnover any proceeds from the sale of the Membership Units to the Bank. The word "Pledge" in the title of the document signed by Dr. Nix clearly alerted him that the proceeds of the Membership Units were pledged to the Bank. Nevertheless, Dr. Nix sold the Membership Units to Crestwood in four separate transactions over a course of seven years, failed to pay the proceeds to PNC, never informed PNC that he had sold the Units, and deceived Crestwood about the existence of any competing interest to the proceeds. Dr. Nix acknowledges that he used the proceeds to pay the Internal Revenue Service and other expenses rather than paying the Bank as required by the Pledge and Security Agreement. Dr. Nix continued to make payments to the PNC during the sale of the Membership Units, further concealing each sale from PNC by subterfuge and deception.

Of particular importance in determining whether Dr. Nix intended to willfully and maliciously injure PNC is the undisputed fact that Dr. Nix repeatedly misrepresented to Crestwood that there was no security interest in the Membership Units. He intentionally concealed from Crestwood that the Bank claimed an interest in the Membership Units. It is clear from the evidence at trial that the sale of the Units was done with actual intent to harm (injure) the Bank based upon Dr. Nix's systematic, repeated, and intentional misrepresentations to Crestwood that

---

[32] *Id.* at 683 (*quoting In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003)).

there were no encumbrances or competing interests in the Membership Units. Dr. Nix's omission to inform PNC regarding the sales and his intentional withholding from the Hospital of any information about the Bank's interest in the Membership Units were calculated to deprive the Bank of notice of the sale of the Membership Units and, thus, the loss of its interest in the Membership Units.

The Defendant also contends that he considered the loan to be a personal loan unconnected to the Membership Units because they could only be owned by attending physicians. However, Dr. Nix admitted that he would have paid by the loan in 2007 from the sales proceeds had Crestwood been willing to purchase the Units at that time. In addition, on the Pledge Agreement signature page, beneath the word "PLEDGOR," Dr. Nix signed his name. Crestwood's CFO, testified that Crestwood wanted to know whether the Membership Units were pledged as collateral because Crestwood wanted the lienholder's permission to pay the doctors selling pledged Units. The documents for each sale required Dr. Nix to represent that the Units he was selling were not pledged. Had Crestwood known that Dr. Nix had pledged his Membership Units to PNC, Crestwood's CFO testified that her office would have sent the Bank a letter advising that Dr. Nix was trying to sell his Units.

Although the Defendant argues that the Bank failed to perfect its security interest in the Membership Units, the Eleventh Circuit has explained that a creditor's failure to perfect its security interest is irrelevant for purposes of § 523(a)(6), writing as follows:

> Bankruptcy courts within this Circuit have held that, whether or not a lienholder's security interest is properly perfected or recorded, where the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under § 523(a)(6).[33]

---

[33]     *Id.* at 684.

Here, Dr. Nix acknowledges that he would have paid the Bank's loan had the Hospital agreed to repurchase the Units in 2007. When the Defendant subsequently sold the Membership Units to Crestwood without providing notice to the Bank, he did so with knowledge of the Bank's claims. Accordingly, the Court finds that Dr. Nix knew that his actions were substantially certain to cause injury to PNC's ability to obtain repayment of its loan for purposes of § 523(a)(6).

### b. Malicious Injury

The Court further finds that Dr. Nix committed a malicious injury because the injury was wrongful and without just cause, and excessive for purposes of § 523(a)(6). The Eleventh Circuit has explained that "a showing of specific intent to harm another is not necessary."[34] Instead, for purposes of § 523(a)(6) "[m]alice can be implied."[35] Indeed, "'[c]onstructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice.'"[36]

Dr. Nix argues that the inference of malice is rebutted by the fact that he continued to make quarterly interest payments to the Bank as required by the loan while he sold the Membership Units and used the sales proceeds to pay business debts and other expenses. In addition, Dr. Nix argues that PNC failed to take reasonable to protect its collateral because the Bank never made a demand for the return of the collateral, refused to declare an event of default, and failed to perfect its security interest. Dr. Nix relies upon the case of *Wolfson v. Equine Capital Corp. (In re Wolfson)*

---

[34] *In re Kane*, 755 F.3d at 1294.
[35] *Id.*
[36] *In re Monson*, 661 Fed. Appx. at 683(*quoting Ikner*, 883 F.2d 986, 991 (11th Cir. 1989)).

14

in which the Eleventh Circuit held that a creditor waived its right to assert nondischargeability due to the creditor's failure to take reasonable steps to protect its collateral.[37]

The Court finds that Dr. Nix's failure to disclose the sale of the Membership Units to the Bank and his intentional and systematic misrepresentation to Crestwood that the Units were unencumbered outweigh any alleged failure of the Bank to protect its collateral or perfect its security interest. In the *Wolfson* case, unlike this case, the lender was aware of and failed to object to the sale of its collateral. Had Dr. Nix or Crestwood informed the Bank regarding any of the Unit sales, the holding in *Wolfson* might be applicable in this case. It is undisputed, however, that Dr. Nix never informed PNC that he sold the Membership Units and never informed Crestwood that the Membership Units had been pledged to PNC prior to each sale.

Further, in *Monson*, the Eleventh Circuit rejected the debtor's excuse that taking the gaming center equipment was not wrongful because the creditor had failed to perfect its interest, explaining that nothing gave the debtor "carte blanche to make off with the equipment he bought with someone else's money."[38] Likewise, the Court finds in this case that Dr. Nix knew that his actions were wrongful and without just cause because nothing in the Pledge and Security Agreement gave the Defendant carte blanche to sell the Membership Units and dispose of the proceeds without paying the Bank's loan.

Although the Defendant testified that he did not understand that he had pledged the Membership Units to the Bank, Dr. Nix's other admissions prove that he generally knows how collateral works.   Dr. Nix admitted that in 2007 he knew that he would have to pay PNC if he sold the Membership Units because they were the Bank's collateral. No evidence was presented at trial

---

[37]     *In re Wolfson,* 56 F.3d 52 (11th Cir. 1995).
[38]     *In re Monson,* 661 Fed. Appx. at 685.

that Dr. Nix had just cause to sell the Membership Units and spend the proceeds without the Bank's permission.   As a practical matter, Dr. Nix's continued payment of the quarterly interest payments on the Note coupled with Dr. Nix's silence about the sales and Dr. Nix's false representation to Crestwood, together evidence a deliberate scheme to intentionally injure the Bank's ability to obtain repayment of the loan by keeping PNC in the dark regarding the on-going sales of the Membership Units. Dr. Nix knew that selling the Membership Units would make it harder for the Bank to collect its loan, yet he sold the Membership Units and intentionally used the proceeds to pay his own expenses. Dr. Nix's testimony that he did not intend to deprive the Bank of any interest in Membership Units is rebutted by the uncontroverted and multiple misrepresentations to Crestwood about the PNC's interest in the Membership Units. Dr. Nix actions were excessive, wrongful and without just cause. Thus, the Court concludes that his actions constitute a willful and malicious injury for purposes of § 523(a)(6).

## II.   Standard under 11 U.S.C. § 523(a)(2)(A)

The Bank further argues that Dr. Nix committed actual fraud under § 523(a)(2)(A) by fraudulently concealing his transfer of the Units and the receipt of the proceeds from PNC.   Not only did he not notify the Bank of the sale, Dr. Nix prevented Crestwood from notifying the Bank by falsely representing to Crestwood in writing that the Units were not pledged.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, or refinancing of credit, to the extent obtained by . . . (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or

16

an insider's financial condition[.]"[39]  "Actual fraud" as used in § 523(a)(2)(A) means "any fraud that involves moral turpitude or intentional wrong" which is "done with wrongful intent."[40]

Relying upon the case of *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016), the Bank argues that the term "actual fraud" does not require that any representation be made directly to the creditor or that money be obtained from the creditor. In *Husky*, the creditor sold products on credit to a company controlled by the debtor.  Rather than paying the creditor, the debtor drained the company of assets that it could have used to pay the debt by transferring large sums of money to other entities controlled by the debtor. The creditor filed a complaint in the debtor's Chapter 7 bankruptcy case seeking to hold him personally liable based on the intercompany transfers, arguing that the inter-company transfer scheme constituted actual fraud for purposes of § 523(a)(2)(A).

The Fifth Circuit in *Husky* had held that a debt is "obtained by . . . . actual fraud" under § 523(a)(2)(A) only if the debtor's fraud involves a false representation to the creditor. The Supreme Court reversed explaining that the term "actual fraud' in § 523(a)(2)(A) "encompasses other traditional forms of fraud that can be accomplished without a false representation, such as a fraudulent conveyance of property made to evade payment to creditors."[41] Although the debtor argued that § 523(a)(2)(A)'s requirement that the debt must be "for money, property, services, or . . . credit . . . *obtained by* . . . actual fraud," the Supreme Court "suggested that the 'obtained by' requirement need not be limited to the debtor, i.e. when property is obtained by those in league with the debtor as a result of the debtor's fraud, the requirement is met for a finding of non-dischargeability under § 523(a)(2)."[42]

---

[39]     11 U.S.C. § 523(a)(2)(A).
[40]     *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).
[41]     *Id.* at 1585.
[42]     *Kern v. Taylor* (*In re Taylor*), 551 B.R. 506, 516 (Bankr. M.D. Ala. 2016)(*citing Husky Int'l Elecs., Inc. v.*

Here, the Court finds that Dr. Nix's actions do not rise to the level of actual fraud for purposes of § 523(a)(2)(A) as contemplated in *Husky* by the Supreme Court. While the Court has determined for purposes of § 523(a)(6) that the Defendant willfully and maliciously converted the proceeds from the sale of the Membership Units, the evidence does not support a finding that the Defendant engaged in any type of fraudulent scheme to convey the Units to another to evade payment to PNC. Nor does the evidence establish that the Hospital was in league with the Defendant. In addition, the evidence does not demonstrate that Dr. Nix intended to deceive the Bank at the time he obtained the loan from PNC. Accordingly, the Court finds that the Bank failed to establish by a preponderance of the evidence that the debt is nondischargeable pursuant to § 523(a)(2)(A).

## III. Damages and Extent of Nondischargeability

The remaining issue before the Court is the extent of damages to be awarded to PNC based upon the Defendant's willful and malicious injury. The Bank seeks a judgment against the Defendant for his entire debt to PNC for the principal amount of $64,602.79, interest in the amount of $9,407.78, attorney fees in the amount of $28,274.90, and late charges in the amount of $638.28, for a total judgment of $102,923.75.

In cases involving the willful and malicious conversion of collateral, "courts have used different criteria in determining the amount of the nondischargeable obligation."[43] Some courts calculate the measure of damages based upon the fair market "value of the property taken" at the

---

*Ritz*, 136 S. Ct. 1581 (2016)).

[43]     *Ocean Equity Group, Inc. v. Wooten (In re Wooten),* 423 B.R. 108, 135 (Bankr. E.D. Va. 2010).

time of conversion. [44]   Other courts have granted nondischargeable judgments for "the unrecovered balance of the claim."[45]   For example, in *Monson* the Eleventh Circuit upheld the bankruptcy court's award of the original loan amount, less the value of equipment recovered.[46] Here, the unrecovered balance of the Bank's claim is $64,602.79, plus interest in the amount of $9,407.78, and late charges in the amount of $638.28, for a total claim of $74,648.85. Accordingly, the Court finds that unrecovered balance of the claim in the amount of $74,648.85 is the appropriate measure of damages under the circumstances of this case.

The Bank also seeks an award of attorney fees in the amount of $28,274.90 contending that it is entitled to the fees under the terms of the Note and Security Agreement.  In the case of *TranSouth Fin. Corp. of Florida v. Johnson*, the Eleventh Circuit held that a creditor that is able to establish the requisite elements for nondischargeability under § 523(a) "may recovery attorney's fees when such fees are provided for by an enforceable contract between the creditor and debtor."[47] Here, the Note and Security Agreement provides that in the event of default the Bank is entitled to collect attorney's fees to the extent permitted by the Bankruptcy Code. The Note and Security Agreement provides as follows:

---

[44]       *Id.* at 136(finding that the "appropriate measure for nondischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than the sum owed by the debtor on a contractual basis").

[45]       *State Farm Mutual Automobile Ins. Co. v. Rodriguez (In re Rodriguez),* 568 B.R. 328, 347 (Bankr. S.D. Cal. 2017).

[46]       *In re Monson,* 661 Fed. Appx. at 681.

[47]       *TranSouth Fin. Corp. of Florida v. Johnson,* 931 F.2d 1505, 1509 (11th Cir. 1991)(awarding attorney's fees under § 523(a)(2)); *see also St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 678 (11th Cir. 1993)(explaining that the phrase "debt" is to be given a broad and expansive reading for purposes of the Bankruptcy Code); *John Deere Co. v. Deresinski (In re Deresinski)*, 250 B.R. 764, 768 (Bankr. M.D. Fla. 2000)("[A] creditor who prevails in a dischargeability action is properly awarded attorney's fees if a valid contract provides for such an award."); *Drexel Highlander LP v. Edelman (In re Edelman)*, 2014 WL 1796217 *43 (Bankr. N.D. Tex. 2014)(*citing Cohen v. de la Cruz,* 523 U.S. 213, 215 (1998)(finding § 523(a)(2)(A) prevents the discharge of all liability arising from fraud, including the award of treble damages) and (*quoting Gober v. Terra Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996)("When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post judgment interest, are likewise nondischargeable")).

19

COLLECTION OF COSTS AND ATTORNEY'S FEES – I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default.   In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (expect where prohibited by law).   To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.[48]

Section 506(b) of the Bankruptcy Code provides that "postpetition interest, fees, costs, or charges may be added as part of the allowed amount of an allowed secured claim to the extent that such claim is oversecured."[49] Here, there is no evidence that the value of the Membership Units pledged to PNC had a value in excess of the amount owed to PNC.[50] It is undisputed that the Bank is unsecured in the Chapter 7 case because the Defendant sold the Membership Units and converted the sales proceeds.   Accordingly, the Bank is not an oversecured creditor entitled to attorney's fees under the Bankruptcy Code.   Also problematic is the requirement in the Note and Security Agreement that an award of attorney's fees under the Bankruptcy Code be "reasonable."   Here, no proof of the reasonableness of the attorney's fees was presented at trial. Accordingly, the Court finds that an award of attorney's fees is not warranted under the circumstances of this case.

## CONCLUSION

For the reasons stated above, the Court finds that the Plaintiff failed to carry its burden of proof that the debt is nondischargeable pursuant to § 523(a)(2)(A) for actual fraud.   However, the Bank established by a preponderance of the evidence that Dr. Nix knew that his actions were

---

[48]     Plaintiff's Ex. 1., p 3.
[49]     4 COLLIER ON BANKRUPTCY ¶506.04 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).
[50]     Although the total sale proceeds exceeded the amount of the debt owed to PNC, it is undisputed that Dr. Nix also sold five Membership Units which had not been pledged to PNC as part of the ten sales.   There is no evidence regarding the total sales proceeds received solely from the Membership Units pledged to PNC.

20

substantially likely to damage the Bank's ability to recover the loan when he sold the Membership Units to the Hospital without informing the Bank that he had sold the Units and without informing the Hospital that the Units were pledged to the Bank. The Defendant committed a malicious injury which was wrongful, without just cause, and excessive because nothing in the Pledge and Security Agreement gave the Defendant carte blanche to sell the Membership Units and dispose of the proceeds without paying the Bank's loan. Accordingly, the debt owed to PNC in the total amount of $74,648.85 is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

A separate order will be entered consistent with this Memorandum Opinion.

**IT IS SO ORDERED** this the 6th day of July, 2018.

/s/   Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge